**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Nov 12 2014, 9:08 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ROBERT P. KONDRAS, JR.**
Hunt, Hassler, Lorenz & Kondras LLP
Terre Haute, Indiana

ATTORNEY FOR APPELLEE:

**BRADLEY A. BOUGH**
Wright, Shagley & Lowery, P.C.
Terre Haute, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DR. STEVEN C. PRESCOTT, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 84A01-1407-PL-287 |
| | ) | |
| ST. MARY OF THE WOODS COLLEGE, | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

APPEAL FROM THE VIGO SUPERIOR COURT
The Honorable David R. Bolk, Judge
Cause No. 84D03-1305-PL-4550

**November 12, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Dr. Steven C. Prescott ("Prescott") appeals the trial court's entry of summary judgment against him and in favor of St. Mary of the Woods College ("the College") on Prescott's complaint, which alleged that the College had breached its contract with him when it terminated his employment as a tenured professor.

We affirm.

## FACTS AND PROCEDURAL HISTORY

In 2004, the College hired Prescott as an Assistant Professor of Music. Prescott holds a doctorate in musical arts. At the College, Prescott's emphasis was on instrumental music, particularly woodwinds and clarinet, and his classes included instrumental music performance, instrument instruction, instrument repair, and music appreciation. In August 2005, Prescott assumed a full-time tenure-track faculty position. Later that year, in December 2005, the then-Chief Academic Officer and Academic Dean, Joanne M. Burrows, S.C., Ph.D. ("Burrows"), sent a letter to Prescott informing him of the College's "painful" decision to reduce the staffing levels in the Music and Theatre Department, based on enrollment and instructional needs, from seven music faculty to five; however, Burrows was pleased to advise Prescott that the College was renewing his faculty appointment for the 2006-2007 school year. *Appellee's App*. at 155-56.

In December 2007, the College's then-president Dr. David Behrs ("Behrs") appointed a Program Analysis Committee ("PAC"), consisting of five faculty and five staff members, to perform a comprehensive analysis of the College's academic and administrative programs in order to improve quality through appropriate resource

2

allocation. Prescott was one of the PAC members. After spending a collective 3,000 hours, the PAC issued a Preliminary Report in September 2008, recommending, among other things, terminating the music major and the music therapy major, reducing the music and theatre department faculty to three people, and discontinuing instrumental lessons. *Id*. at 241. Behrs distributed the Preliminary Report along with a Memorandum to the College Campus Community, explaining that no decisions had been made as to the Preliminary Report's recommendations, the process was ongoing, and all academic departments would have the opportunity to schedule meetings with the President and the governing Cabinet to discuss the program ideas.

In March 2009, Behrs and then-Vice President for Academic Affair ("VPAA") Maggy Smith, Ph.D., sent a letter to Prescott informing him that the College was promoting him to Associate Professor and awarding him tenure status.[1] *Appellant's App*. at 35. In May 2009, the College sent to Prescott a two-page "2009-2010 Academic Year Full-Time Faculty Appointment" ("Contract"). *Id*. at 37-38. The Contract required, among other things, that Prescott teach twenty-four credit hours or the equivalent during the academic year. The Contract's offer of employment became valid upon Prescott's acceptance, which was indicated by his signature. Prescott signed the Contract, as did President Behrs and VPAA Smith. Thereafter, the College sent Prescott a Contract, containing basically the same terms as the 2009-2010 Contract, for each subsequent academic year during his employment at the College. *See id*. at 40-47.

---

[1] The tenure process at the College is a faculty-led process where a committee reviews the qualifications of applications for tenure-track faculty positions. The College administration plays little part in the tenure process. *Appellee's App*. at 224-25.

The Contract referenced the Faculty Handbook ("Handbook") a number of times, including a statement requiring that "Faculty Member will comply with the requirements and standards of the [Handbook], as amended from time to time[.]" *Id*. at 37. The Handbook was drafted as a joint effort between a Faculty Handbook Committee and the VPAA and was approved annually by the College's Board of Trustees. *Id*. at 292, 295.

Section 4.4 of the Handbook outlined the circumstances under which a tenured faculty member could be terminated. It identified the following four reasons: (1) prolonged mental or physical illness; (2) financial exigency (an imminent financial crisis that threatens the College as a whole); (3) changes in the educational program; and (4) adequate cause. If the College terminated a faculty member under the third reason, changes in the educational program, the tenured faculty member "shall be accorded the same offers of new positions as cited under Financial Exigency." *Id*. at 98. Those are:

> First, the tenured faculty member shall be offered a teaching position in another department in an academic area in which the person is professionally competent. Secondly, the tenured faculty member shall be offered a position, if available, on the administrative staff commensurate with the individual's expertise and experience. Thirdly, the tenured faculty member, having refused to accept either of the above offers, shall be terminated, but shall retain the right to be rehired if the position eliminated is restored within two academic years of the termination.

*Id*.

In October 2009, then-President Behrs issued to all staff and faculty a Final Report concerning the Program Analysis that had begun in 2007. The Final Report included recommendations to continue music, music education, and music therapy majors, with a review to occur no later than spring 2011 to determine sustainability, which would

4

depend on actual recruitment and retention of students. Beginning in 2010, the College no longer enrolled students as instrumental music majors. *Appellee's App.* at 134. Prescott served a one-year appointment as the Music and Theatre Department chairperson for the 2010-2011 academic year. Prescott's peer reviews during this period were unfavorable.

In May 2012, the then-VPAA Janet Clark, Ph.D. ("Clark"), sent Prescott a Contract that extended his appointment as Associate Professor in the Music and Theatre Department through the 2012-2013 academic year. That same date, she wrote a letter to Prescott, stating, in part:

> As you are well aware, we are teaching out the Music Education and instrumental emphasis in the Music core major at [the College]. Due to the reduced number of students remaining, the next academic year 12-13, may be the final years of the program and the last one in which we can support a full-time faculty member in that area. Because of program eliminations, your services may no longer be needed at the [C]ollege once the program is completed even though you have been awarded tenure status.

*Appellee's App.* at 270. In response, Prescott sent a letter to Clark, expressing his concerns about her letter, stating that if his particular position is eliminated, he would be very willing to take another position in the Music and Theatre Department or any other department, or would be willing to take an administrative role at the College. *Appellant's App.* at 52.

5

On May 6, 2013, Clark sent Prescott a letter notifying him that the College was terminating his tenured faculty appointment at the end of the 2012-13 school year.[2] *Appellee's App.* at 105-06. The reasons for the termination were the changes made in educational programs offered in the Music and Theatre Department, including elimination of the music education and instrumental emphasis program. Clark identified efforts made by the College to arrive at other teaching or administrative duties to fill the necessary twenty-four hours for a full-time contract, but stated they were unable to successfully do so, either because no positions were available or he was not qualified for those that were open. With the letter, Clark enclosed two pages from the Handbook regarding the procedures related to grievances for termination. The letter advised Prescott that, "[s]hould [he] wish to waive the grievance procedure and accept the severance offer," he would be paid certain dollar amounts. *Id.* at 106.

Prescott did not file a grievance with the College. Rather, on May 13, 2013, Prescott filed a complaint against the College, alleging breach of contract. He amended the complaint on September 11, 2013, adding a second count under Indiana's Wage Claim Statute.[3] Both the complaint and the amended complaint alleged that the Handbook was incorporated into each of Prescott's Contracts for the academic years 2009-2010 through 2012-2013. *Id.* at 5-6.

---

[2] The record before us indicates that prior to that termination letter, Prescott emailed Clark in March 2013 to tell her that "there seems to be a rumor going around" that he would be leaving at the end of the semester. *Appellant's App.* at 54-55. She replied by email and reminded him that she had warned him in May 2012 that that could be his last year, despite his tenured status, and she encouraged him to arrange a meeting with her as soon as possible. They met, along with department chair Dr. Tracy Richardson, either before or around the date of Clark's May 6 letter to Prescott, to discuss possible alternatives to termination.

[3] The parties mediated the wage claim, leaving only the breach of contract claim.

Prescott filed a motion for partial summary judgment on February 28, 2014, arguing that the College had breached its Contract with him. Prescott's position was that the Contract comprised their entire agreement – and that the Handbook was irrelevant to the matter – and that because his Contract with the College was for a definite term of years, under Indiana law, the College could only terminate him for "just cause" or by mutual agreement, neither of which were the reasons for his termination. *Appellant's App*. 11. Alternatively, Prescott argued that even if the Handbook were to be considered in the analysis, the College still breached its Contract with him because it failed to offer him alternative faculty or administrative positions that he refused before terminating him, as is required by the Handbook.

The College filed its own motion for summary judgment, alleging it was entitled to judgment because Prescott failed to follow the grievance procedure provided in the Handbook, and thereby failed to exhaust administrative remedies before filing suit. The College also argued that there was no breach because the College offered him other jobs for which he was qualified, although in a part-time adjunct capacity because that was all the College needed.

The trial court conducted a hearing in April 2014, at the conclusion of which it took the summary judgment motions under advisement.[4] Thereafter, in June 2014, the trial court, in a one paragraph order, granted the College's motion for summary judgment

---

[4] We note that a copy of the transcript of the hearing is not included in the record before us.

and denied Prescott's.[5]  Prescott now appeals.

## DISCUSSION AND DECISION

### I.      Standard of Review

Prescott argues that the trial court erred when it denied his partial motion for summary judgment and granted summary judgment in favor of the College.  On review of a trial court's decision to grant or deny summary judgment, we apply the same standard as the trial court.  *Reed v. Reid*, 980 N.E.2d 277, 285 (Ind. 2012).  The moving party bears the initial burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.  If the moving party carries its burden, then the nonmoving party must come forward with evidence establishing the existence of a genuine issue of material fact.  *Id.*  We may consider only those portions of the pleadings, depositions, and any other matters specifically designated to the trial court by the parties for purposes of the motion for summary judgment.  *Birch v. Midwest Garage Door Sys.*, 790 N.E.2d 504, 509 (Ind. Ct. App. 2003); *see also* Ind. Trial Rule 56(C), (H).  Any doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmoving party.  *Birch*, 709 N.E.2d at 509.  The trial court's decision on a motion for summary judgment comes to us cloaked with a presumption of validity.  *Haegert v. McMullan*, 953 N.E.2d 1223, 1229 (Ind. Ct. App. 2011).  The nonmovant has the burden of demonstrating that the grant of summary judgment was erroneous.  *Id.*

---

[5] Findings of fact and conclusions of law thereon are neither required nor prohibited in summary judgment context.  *Birch v. Midwest Garage Door Sys.*, 790 N.E.2d 504, 516 (Ind. Ct. App. 2003).

## II.     The Handbook

Initially, we address the issue of the applicability of the Handbook. Prescott claims that it has no bearing and that the only consideration is the Contract signed annually by Prescott, and because the Contract is not ambiguous, there is no need to consider extrinsic evidence such as the Handbook. Prescott contends that, only if the term "tenured" is found to be ambiguous, is the Handbook relevant to the analysis. The College asserts that the Contract, on its face, references the Handbook on a number of occasions and incorporates the Handbook by reference. We agree with the College.

The Contract, which Prescott received and signed annually, was entitled "ACADEMIC FULL-TIME FACULTY APPOINTMENT" and directly beneath that language appeared, "[Reference: *Faculty Handbook (FH)* 1.6-6; 2.1-6]." *Appellee's App*. at 275. Those identified sections of the Handbook concern the subjects of "Faculty Appointments and Contracts" and "Faculty Responsibilities and Expectations." *Appellant's App*. at 69-82. Later in the Contract, it states, "Faculty Member will comply with the requirements and standards in the *FH*, as amended from time to time according to procedures specified in the *FH*, including the Mission Statement." *Appellee's App*. at 275. The Contract also mentions, "Promotions must be earned as authorized by the *FH*. Deadlines, procedures, criteria, and standards for promotion consideration are set forth in the *FH*." *Id*. at 276. The Contract further references the Handbook when it states, "Tenured members of the faculty shall be formally evaluated every three years by the Chairperson (*FH* 3.8.A.4)." *Id*.

9

Prescott argues that the Handbook is not a contract as evidenced by Handbook Section 10.3, titled "The *Faculty Handbook* and terms of employment," which provides that the Handbook "should not be considered as part of the contractual agreement." *Appellant's App.* at 125. That, however, is not all that it says. More fully, it reads:

> The faculty member's most recent employment letter contains the terms of the employment contract. Unless that letter contains terms that expressly supersede the information contained in this *Faculty Handbook*, the *Handbook* should be considered as governing the faculty member's employment. It should not, however, be considered as part of the [C]ollege's contractual agreement with the individual faculty members. The *Handbook* is designed to serve as a guide to the relationship between the faculty members and the college, and it seeks to outline duties, rights, and responsibilities of faculty members.

*Id.* While the Handbook language on one hand states that "[i]t should not … be considered as part of the [C]ollege's contractual agreement," it also states that "the Handbook should be considered as governing the faculty member's employment" and it "outlines duties, rights, and responsibilities of faculty members." *Id.* We find it is not necessary to resolve this apparent conflict, however, as Prescott expressly alleges in his complaint that the Handbook is incorporated into each of his Contracts with the College. *Appellee's App.* at 5-6. Indeed, Prescott alleges that the College violated the Handbook by its failure and refusal "to make any offer, or even look for, an alternate faculty position" or "an available administrative position" for him. *Id.* at 8. Prescott also claims that the College had no factual or legal basis to terminate Prescott, "[a]s shown by Prescott's written contracts, the incorporated provisions of [the College's] faculty handbook, and the legal concept of tenure[.]" *Id.* at 9.

10

On appeal, Prescott cites to a number of Indiana cases that hold an employee handbook does not create a contract. *Appellant's Br*. at 14, 20 (citing, *inter alia*, *Orr v. Westminster Vill. N., Inc*., 689 N.E.2d 712, 720-21 (Ind. 1997); *McCalment v. Eli Lilly & Co*., 860 N.E.2d 884, 890-93 (Ind. Ct. App. 2007)). With this general proposition, we do not disagree. The Handbook at issue does not create a contract; one already exists by virtue of the academic-year Contract signed annually by all parties. The Contract incorporates by reference the expectations, procedures, policies, and responsibilities of both parties as provided in the Handbook. Indeed, Prescott asserted in his complaint that his annual Contracts incorporated that Handbook and that the College failed to follow the Handbook's procedures and policies, thereby breaching its contract with him.

The trial court granted the College's motion for summary judgment, which sought judgment in its favor either on the basis that (a) Prescott failed to file a grievance as provided in the Handbook, or (b) the College properly offered him all available faculty or administrative positions for which he was professionally qualified; both of those theories are premised in the applicability of the Handbook to Prescott's claim. In granting the College's motion, the trial court evidently concluded that the Handbook was relevant and applicable. We agree and find no trial court error in that regard.

### III. The College's Motion for Summary Judgment

We next consider the trial court's decision to grant the College's motion for summary judgment. The order reads, in pertinent part, that the trial court, having taken the parties' respective motions for summary judgment under advisement,

11

now finds that there is no genuine issue of material fact and that Defendant [College] is entitled to judgment as a matter of law. The Court therefore enters judgment for [College] and against [Prescott].

The Court DENIES [Prescott's] Motion for Partial Summary Judgment.

*Appellant's App*. at 8. From this, we do not know the basis upon which the trial court granted the College's motion; however, upon review, we will affirm the grant of summary judgment upon any legal basis supported by the designated evidence. *Merrill v. Knauf Fiber Glass GmbH*, 771 N.E.2d 1258, 1264 (Ind. Ct. App. 2002), *trans. denied*.

The Handbook defines tenure:

Tenured status means continuous appointment and employment by this College. A tenured faculty member shall not be terminated except under the conditions as specified in this Handbook.

*Appellee's App*. at 65. As VPAA Clark testified in her deposition, continuous appointment is not the equivalent of permanent and guaranteed employment without condition. *Id*. at 207-08. The Handbook identified four circumstances in which tenured faculty could be terminated: (1) prolonged mental or physical illness; (2) financial exigency; (3) changes in educational program; or (4) adequate cause, which would include factors such as incompetence, gross violation of policy, or failure to follow professional canons. *Id*. at 71-72. The basis upon which the College relied for Prescott's termination was changes in educational program, specifically a reduction in the Music and Theatre Department classes and faculty and an elimination of the instrumental music

12

major.[6]  In her deposition, then-President Dottie King explained the reason for Prescott's termination as follows:

> The college decided that . . . for economic reasons and for enrollment reasons and after . . . years of not only studying this issue, but putting forth extra effort could no longer support the instrumental music program in the Department of Music for several reasons.  We were unable to recruit enough students to make that program sustainable, so it was a financial decision to eliminate that program.

*Id*. at 309-10.  Here, Prescott does not appear to challenge the fact that there were reductions in the Music and Theatre Department staff and classes or that legitimate reasons supported those decisions.  Indeed, in as early as 2005, there was an advisement circulated that the music program was being reduced.  Thereafter, the College's President Behr formed the PAC to study, evaluate, and recommend cost-saving measures through the College's programs.  Prescott served on the PAC that issued a report in 2008 recommending, among other things, the elimination of the instrumental music major, as well as other cutbacks.  In 2012, VPAA Clark advised Prescott that due to the reduction in the music program enrollment, that the 2012-13 academic year might be the final year that his services would be needed.  The relevant provision in the Handbook states that if a tenured faculty member is terminated for changes in the educational program,

> First, the tenured faculty member shall be offered a teaching position in another department in an academic area in which the person is professionally competent.  Secondly, the tenured faculty member shall be offered a position, if available, on the administrative staff commensurate with the individual's expertise and experience.  Thirdly, the tenured faculty member, having refused to accept either of the above offers, shall be terminated, but shall retain the right to be rehired if the position eliminated

---

[6] While students may still graduate with a music major from the College, having an instrumental core has been eliminated from the music program, and now the major must be in either voice or piano. *Appellant's App*. at 277.

is restored within two academic years of the termination.
*Id.* at 71. The crux of Prescott's argument is that the College did not offer alternate faculty or administrative positions to him before terminating him. The College maintains that it was not obligated to offer any and all positions to Prescott; rather, its obligation extended only to those positions for which Prescott was professionally qualified, commensurate with his expertise and experience.

The designated evidence in the record before us reveals that, on or near May 6, 2013, Prescott met with Department Chair Richardson and VPAA Clark. Prescott and Richardson presented a Faculty Teaching Load Projection ("FTLP") to Clark that would allow Prescott to maintain the necessary twenty-four-hour course load; the FTLP included the proposal that Prescott teach two General Studies courses at the College. Clark testified that Assistant Dean Jackie Fischer determined that Prescott was not qualified to teach those classes, and thus, they were not offered to him. Prescott acknowledged in his deposition that, although he did not personally agree with that determination, reasonable minds could differ as to whether he was qualified to teach those classes and that Clark's decision was a professional one, not motivated by ill will.

Even taking those classes out of the equation, Clark argues that the College continued to offer all of the other courses that he had been teaching, such as clarinet and flute lessons, music history courses, aural skills courses, and music for living, and he asserts that the College even hired outside adjunct faculty to teach the classes, designating classified advertisements and other postings to illustrate the teaching openings. Clark testified that while some classes were still being offered, some were not

14

expected to "make" enrollment and others such as woodwinds and clarinet were eliminated. *Appellee's App*. at 298. Clark further testified that the classes still being taught did not constitute a full course load, as is necessary for a tenured professor. *Id*. at 212. When Prescott was asked if the classes still being taught would total the necessary twenty-four-hour course load, Prescott admitted that he had "no idea." *Id*. at 140. Clark conceded that the College found it necessary to seek outside adjunct teachers, but testified that the College first "offered [Prescott] those hours to teach" as a part-time adjunct position, and because he declined, the College hired outside staff to teach the classes. *Id*. at 211. During Prescott's deposition, counsel for the College asked him, "Is there a teaching position for classes that you are able to teach and competent to teach in the area of your expertise that you believe had not been offered to you at the [C]ollege that would provide you with a full-time position?" and Prescott replied, "I don't know what's offered or the enrollment or anything." *Id*. at 146.

Turning to any alternate administrative position, the College maintains that, as with the faculty positions, the College was only required to offer him positions if he was professionally qualified for them. Initially, we observe that Prescott testified that he was not interested in any full-time administrative positions and did not apply for any, as he desired to continue teaching. *Id*. at 137. There is some suggestion that Prescott was interesting in assuming the Department Chair position; however, not only was that currently occupied by a tenured professor (Richardson), but Prescott previously had held that administrative position for a one-year post and had received unfavorable peer reviews; accordingly, the College determined the position was neither available nor

15

suitable for Prescott. That one-year Department Chair position was the only administrative job that Prescott had ever held, both at the College and before his employment there. *Id*. at 123-24.

Three other possible part-time administrative positions that Prescott designated to the trial court as being available but not offered to him by the College were that of Registrar, Assistant Director of Campus Admissions, and Assistant Director of Distance Admissions. Clark testified that the College was a small school and the position of Registrar was an important position, which the College needed to fill with someone that knew how to do it, and Prescott did not possess that experience or knowledge. Similarly, Clark stated that Prescott had no experience with Distance Admissions, having participated little, if any, in the distance recruiting process. Clark likewise testified that she did not consider Prescott to be qualified to assume the Assistant Director of Admissions role, as the only experience he had at the College, or even before his time there, was the Department Chair position, for which he did not receive favorable reviews. Upon examination, Prescott was asked, "[W]hat expertise or experience do you believe you have that would qualify you for an administrative position that was overlooked that was not properly evaluated?" Prescott replied, "I don't know." *Id*. at 145- 46. Prescott did not identify any other specific administrative positions for which he was qualified that the College failed to offer him as alternate employment. While Prescott argues that the College's position that it had no work for him was "untrue and factually disputed," he has not established that a genuine issue of material fact exists to preclude summary judgment for the College. *Appellant's Br*. at 17. The trial court's grant of summary

16

judgment in favor of the College was proper.[7]

## IV. Prescott's Partial Motion for Summary Judgment

We next address whether the trial court properly denied Prescott's partial motion for summary judgment. He asks this court to reverse the summary judgment entered in favor of the College, enter summary judgment in his favor, and remand for a trial on damages. We note that the fact that the parties have filed cross-motions for summary judgment does not alter our standard of review, as we consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Reed,* 980 N.E.2d at 285.

Prescott asserts he was entitled to summary judgment on his breach of contract claim on either of two theories. First, he argues that we should look no further than the Contract, *i.e.* the annual academic-year faculty appointment and *not* the Handbook, and under that Contract, his employment was for a definite term. In such a case, where one is employed for a definite term, as opposed to being an employee at-will, Indiana law provides that the employer may terminate that individual only for "just cause" or when the termination is by mutual agreement. *See Orr*, 689 N.E. at 717. In this case, it is undisputed that Prescott was not terminated for "just cause" or by mutual agreement; therefore, Prescott argues, the College breached the Contract.

We agree with Prescott to the extent that, as a tenured professor, he was not an at-

---

[7] Because we find that summary judgment for the College was proper on the basis that it terminated Prescott due to changes in the College's music program and that it assessed any available teaching and administrative positions before terminating him, we need not consider the College's other claimed basis for summary judgment concerning Prescott's decision not to file an internal grievance via procedures outlined in the Handbook.

17

will employee; he had a Contract with the College. However, the trial court was not persuaded that the terms of the Handbook, including those relative to termination of a tenured employee, were inapplicable and should be excluded from consideration, nor are we. The Contract references the Handbook a number of times, including in the title of the document. More importantly, Prescott alleged throughout his complaint and amended complaint that the Handbook is incorporated into his contracts with the College and that the College breached the contract by failing and refusing to offer him alternative faculty or administrative positions at the College before it terminated him. Prescott has failed to establish that he is entitled to judgment as a matter of law on his breach of contract claim because the College did not terminate him for "just cause" or by mutual agreement.

Prescott alternatively argues that, even if it would be appropriate to consider extrinsic evidence such as the Handbook, the College failed to offer him other faculty or administrative position(s) at the College before terminating him, as required by the Handbook, and the College thereby breached its Contract with him.

Prescott asserts that the College continued to offer courses that he had taught and that, in fact, the College was hiring outside teaching staff to cover those classes. In support of his argument, Prescott designated some advertisements and internal emails to illustrate the College's attempts to find adjunct faculty to teach classes, including aural skills classes, conducting, music history II, and music for living, although the email noted the concern that the music for living class "may not make." *Appellant's App*. at 141, 275. Other classes mentioned in the emails were a flute instruction class with one student, and a clarinet instruction class with two students. *Id*. at 137. Prescott also designated

18

evidence that, in addition to seeking adjunct teachers, some of the professors in the Music and Theatre Department were on "overload" status. *Id*. at 182. In her deposition, Clark explained that "some" of the courses that Prescott had taught were still being offered in the 2013-14 school year, but that "[t]hese courses do not come up to a full load." *Id*. at 176, 191. She further explained that adjunct faculty was hired to teach the classes because Prescott declined the offer to do so.

With regard to administrative jobs, Prescott asserts that a number of administrative jobs opened up and the College did not offer them to him nor did he refuse them; accordingly, he argues, the College breached its Contract when it terminated him. The College, in turn, designated evidence that Prescott did not want and would not apply for a full-time administrative position, and as for the part-time administrative positions proposed by Prescott, Clark testified that she considered him for "all [positions] that she saw," but the College ultimately determined he was not qualified and thus did not "directly" offer any to him. *Id*. at 195, 250.

To be granted summary judgment, Prescott needed to establish that no genuine issue of material fact existed on his claim that the College failed to offer him alternate employment as is outlined in the Handbook, which required the College to offer him faculty or administrative jobs for which he was professionally competent or qualified based on his expertise and experience. He has not designated evidence to establish as a matter of law that the College did not do so. Accordingly, we find that the trial court's denial of Prescott's summary judgment motion was proper. Affirmed.

BAKER, J., and ROBB, J., concur.